No. 06-1001, the Navy v. Northrop Grumman. Mr. Wachowski. Good morning. May it please the Court. The Board's decision below, which results from a hearing restricted to the liability phase, is legally flawed in three distinct respects and requires reversal by this Court. At the outset, I wish to remind the Court that a This contract involved a critical component of an anti-submarine system necessary to protect destroyers at sea. Moisture in the transducer tubes compromised the performance of that system, and compliance with the contract's requirements in this case was so critical that the contract included the FAR provision for the higher-level contract quality requirements as well as the quality program requirements of Mil Q9858A. The contract required that the transducers perform satisfactorily in seawater in temperatures down to one degree below centigrade, and although shipsets previously had been installed without incident in the warmer waters of the Gulf of Mexico, when shipsets were installed in two destroyers in the cold winter waters in Maine, the transducer tubes leaked, and they leaked significantly. Okay, but I'm confused about what the record is here. There were, on this paint preparation issue, there were 328 transducers that were tested, is that correct? The evidence provided to the Court demonstrated roughly a range of 2,500 transducer tubes, of which not all showed defects. No, no, but how many were actually tested? Is my number right? Is it 328 were tested? Your Honor, I'm not completely sure about that. Well, I thought it was 711, but I don't know. I thought it was they found problems in 383 out of the 711 that had been tested. Your Honor, I don't know. Gee, you really should know when you come here to argue on a critical point like this. Isn't it important to know, I didn't want to interrupt, but to reinforce that point, to know the significance of the number of tests to the overall charge of defective product? Your Honor, I apologize. I do not know the specific numbers among the units that were tested. I know that there was a great deal of testing activity undertaken by both the Navy and Northrop. Well, the Navy's tests, normally what one would expect where you have a run of 10,000 transducers is that you'd hire an expert who would design a sampling process and do random sampling and take the results of that. The expert would testify that the results of the random sampling were representative of the whole run. One of the things you would suppose that the expert would testify is that there weren't any changes in the paint preparation techniques over the course of time, which would make the sampling inapplicable to the entire run. And did you have any testimony like that? We did not, Your Honor. Well, why not? There are a number of reasons why not. In this instance, Your Honor, this is a case where the Navy does not have access, does not have the ability to ascertain the extent of latent defects without conducting destructive testing. Well, you could conduct destructive. You could have designed a thing, a program, and done destructive testing on a random basis and presented that evidence. It's very odd to me that you wouldn't do that. How was the sample selected? Whatever the size, whether Judge Prost is correct or I'm correct, how was the sample size determined? How was it determined which ones to test? I believe, Your Honor, that the ones tested were actually, it was based on what was out in the field and what was failing. It was not a sample per se. What do you mean it was based on the ones that were failing? In particular, the transducers being installed in the two destroyers in Maine. But there were transducers that were tested that didn't fail. And that's certainly the case. Well, how were those selected? It was not, they did not have uniform failure across the board. But how did, there was some number, whether it's 711 or I guess my number was 300, I'm not sure which is right, but not all of the ones that were tested failed, right? That is correct, Your Honor. How was the test sample selected? You're saying it was an adequate sample, should have led to an award with respect to all 10,000. How was the sample selected? Perhaps I need to clarify the point, Your Honor. We are not saying that it was an adequate sample. We are suggesting, our argument is that it is not the Navy's burden to demonstrate the full extent of the latent defect, which the board found to exist. Because the board, as the board found, the testing required to ascertain the existence of, for example, inadequate surface preparation was destructive in nature. The contractor bore the responsibility under the contract to maintain height, to do the testing, to do the inspections, and to maintain test records.  But they gave you the test records in the course of discovery, right? They gave you the documents you asked for. Actually, Your Honor, the government received some test results, but for example, with respect to the type WRT neoprene issue, the government never received compression test results. Well, let's stick with the paint for a moment. Were there documents that you requested with respect to the paint preparation you didn't receive in discovery? I beg your pardon, Your Honor? Were there documents concerning the paint preparation that you didn't receive in discovery that you requested? I don't know about paint preparation documents that were withheld, Your Honor. I do know. Well, why shouldn't the burden of proof be on you? I mean, whatever records they kept, you asked for them, you got them, and you could have shown that they didn't keep adequate records. You could have raised that. You could have said that because they didn't keep adequate records, we shouldn't have the burden of proof. But you're not making an argument like that, right? We are making the argument that where a party has greater access to the information, and under the contract, there is... No, but you're not making the argument that because of their inadequate record-keeping about testing. I'm just talking about paint preparation here. You're not making the argument that because of inadequate record-keeping on paint preparation that the burden of proof should be on them, right? That's correct. With respect to the inadequate surface preparation, we are not making that argument. With respect to that one, Your Honor, the Navy was able to convince the Board that 26% of the production was defective, and the Board simply held that since the Navy didn't prove and this was the standard laid down before you, all or substantially all of the production was defective. That's the burden the Navy was asked to satisfy. The only way the Navy could have demonstrated that all or substantially all of the transducers had inadequate surface preparation was to destroy all or substantially all of the transducers. But that's just not true. That's absolutely untrue. What you had to do, maybe you had to do destructive testing. There seems to be a dispute about that, but you could have taken a sample and done destructive testing on a sample. You didn't have to destroy all of them. And another remedy which I would submit is more reasonable in terms of public policy and in terms of making sure we don't go out and order an overly inclusive remanufacturing order is to go to the contractor, as the Navy did in this case in June and July of 1997, and ask the contractor, what is it about this performance, this contract, that's different from the 1990 contract which you performed without problems? We want to restrict the remanufacturing order. We don't want to order everything to be remanufactured. Northrop's response was out of scope. We declined to provide that information. But the facts are, are they not, that at least at some point early on, before I think they had even responded, the Navy undertook to do the remanufacturing of all the transducers. Am I incorrect about that? No, that is not correct, John. The remanufacturing order was issued in September of 1997. Ultimately, the Navy remanufactured three of the 17 ship sets. Northrop remanufactured 13 of the ship sets. But during the summer of 1997, in June and July of 1997, as we've set out in our brief, Northrop was asked to provide information required by the contract. Tell us how the transducers, is this a pervasive problem? Is it restricted to a subset of the transducers? Northrop refused to come back with information. I don't understand, where was the error before the Board? All of this factual development was extensively before the Board. Northrop was found liable for a certain amount. Most of the ship sets were redone. And I gather none of that is at issue. What is it now that the Navy, where did the Board go wrong? On the evidence that was adequately and fully provided and with the burdens appropriately placed. Well, the Board went wrong by requiring the Navy to demonstrate that substantially all the transducers contained latent defects. Well, even if so, you've just repeated that Northrop did redo, you said, 16 of the ship sets. They remanufactured 13 of the ship sets. Out of a total of 16. Right, 17. There were a total of 17 ship sets. Ultimately, one was not remanufactured. What is it now that, what is the relief that you want? You're complaining about what the Board did. You haven't told us where the evidence was contrary to what they did. And it's far from clear what the additional remedy is that you're asking for other than discipline. If the, as the Board's application of its, by requiring the Navy to show all or substantially all, the Board, in essence, although the Board has not reached the quantum phase, the Board has made liability determinations that will result in a finding for Northrop Grumman for roughly three-quarters of its costs, I imagine. Just drawing it. In other words, it's the answer to Judge Newman's question. There were 9,800 transducers that the government told Northrop to do over. And under the Board's ruling, I'm just trying to see if I understand this. Under the Board's ruling, like, Northrop had to bear the cost for about 2,200 of those. And the government, the Navy, had to bear the cost for the do-over of the other portion. So is the government's argument that they should, Northrop should have had to pay the cost for the remainder of 7,800 minus 2,200? Exactly. Is that the answer to Judge Newman's question? Exactly, Your Honor. Because. And one of the main arguments you seem to make over and over again in your brief is that that's because when they found 26% defective, that should have sort of shifted the burden over to Northrop? Yes. Okay. What is the 25%? Back to sort of Judge Dyke's first point. What is the 25% based on? Where do we get that number? That is based upon the evidence that the Navy was able to. No, but how is the calculation, 25%? What two numbers were used to calculate the 26%? Your Honor, if you wish, I can get it from the Board's opinion. I know that the Board went through its own analysis of transducers where it looked at videotapes and came up with its own calculation of the 26% failure rate. But it seems to me the problem for you, if you're relying largely on this calculation, that 26% was high enough so that it should have required a do-over of all the 9,800 transducers, it seems to me you maybe ought to go back and look at how the Board arrived at this calculation because it wasn't just we've sampled the entire thing and we think 26% of the entire range is defective. That was not the type of calculation it did. It confined the range and it looked at the sample of 711 and found what range that comes in. And it was based on that that they arrived at this 2,600 do-over. It wasn't based on a range of samples, problems across the Board, and therefore you do 26% across the Board. And I think that makes your argument deficient. It means that the 26% doesn't support the weight you put on it. Your Honor, I do want to reserve at least 30 seconds for rebuttal. But just to make the point is that having demonstrated a latent defect, which is what the Navy did and the Board found that, we believe the Board then should have shifted the burden to Northrop Grumman with greater access to the information to demonstrate that the problem was not pervasive. But why did they have greater access to information? You got the information in discovery. Well, we certainly did not get information regarding the compression set tests, which were relevant to the type W neoprene. But on the paint preparation, you got everything you asked for. What information did they have that you didn't have? Well, again, the type W neoprene, Your Honor, No, no, on the paint preparation. I'm not aware of any that we didn't get through discovery. It's a good public policy to require the Navy to go to litigation in order to get appropriate contract administration. I suggest it is not. Okay. We've exhausted your time, Mr. Warshawski. Thank you, Your Honor. Ms. Brinkman. May it please the Court, the Armed Services Board of Contract Appeals correctly held that the Navy is not entitled to require that Northrop Grumman bear the cost of remanufacturing nearly 10,000 transducers. Let me tell you what the problem I see from your side is. You've got a situation in which perhaps the Board could have gone either way on the facts. They could have said that the proof was sufficient to require the 10,000 be redone, or they could do as they did and say that only 2,200 have to be redone. And the difficulty I have with the Board decision is that the Board decision seems to rest in part on the notion that a 10% failure rate was appropriate under the contract, and that apparently comes from the Navy's decision that they would take a ship out of service if it had more than a 10% failure rate. I don't see any provision in this contract that suggests that a 10% failure rate is acceptable, and I'm troubled by the Board's references to a 10% failure rate being okay. And it may be, in my view, that the decision not to remanufacture, require a remanufacture of the whole 10,000, rests on that erroneous premise that the government had to show a higher than 10% failure rate. In any event, that's the problem. I don't think it does, Your Honor. I think it's important to understand how this number came about. The examination of the evidence included 711 transducers. Out of that, there were only 102 that were found to have any late paint delamination, 102, 1%. That was extrapolated by the Board. 1%? That's not 1%. 1% of what? 10,000. But you didn't measure 10,000. No. But that's all there was proof that there were actually defects in them. The Navy only proved those. I don't understand what you're saying. Certainly, sampling is an appropriate and commonly accepted way of establishing that there is damage which goes across the Board. Absolutely. Sampling is appropriate. We agreed to sampling, Your Honor. So what's wrong with the sampling? It wasn't a random sampling.  Most of them came from one ship, it seems. They don't know. We agreed to random sampling. We agreed to sampling of each transducer, which is not destructive. There was a crosshatch possibility of simply testing the paint. The Navy refused to do that because of the aesthetic look, although the contract would have allowed a barco-bound remedy to that. That would have been contractually compliant to do that kind of testing. Every transducer in the Navy rejected that. Well, did you do any sampling of your own? During this time, there was testing. We never did any systematic testing. We did not have access to the transducers. The Navy had them. We had already delivered 16 of the 17 ship sets. So you suggested random sampling, and they said? No. What happened was this came. Why did they say no? Because they viewed the sampling as impairing the transducers? Right. It would not be aesthetically pleasing to have this type of barco-bound. Did you suggest random sampling by destructive testing? Yes. That was also considered. Why did they say they didn't want to do that? They said they could not get disagreement on how the tests would go about. Frankly, Your Honor, they wanted all of these redone. That's the bottom line. But I'm a little confused about the sampling. I thought they picked the 711. It wasn't completely random. I understood the board to say there was a raid. Yes. Of 4,000-something. What I was going to ask you about is why, if you're going to do sampling and you're going to pick 711, you would have only included the mid-range of 4,000 as opposed to the broader range of 9,000, which ultimately seemed to have dictated a smaller size of do-overs on your part. Where did we get the 711 out of the 4,000? The 711 were ones that were actually subjected to testing, and then in addition to that, there were videotapes of visual inspections on paint delamination on transducers. The board looked through hours and hours of these tapes to really help the government make their case because they never made that case, and the board sat there and counted up 711 transducers with the serial numbers. The videotape shows the transducers. What are the tapes? They're videotapes of a transducer being put down, a camera showing where there's paint delamination, and you can see the serial number. So through all of that examination and some testing, there were 711. There were 711 that they looked at? Yes. Out of those, 102 showed paint delamination. But they were chosen from those that had failed, were they not? Were those that were in the cold water more likely to have failed? Not all of them, Your Honor. Well, maybe not all of them, but they were not random, I gather, that they did concentrate in the areas in which failures had been observed. I don't believe so. I don't believe the record is clear on that. Really, these videotapes were shown of some going back. It doesn't say that they're random, and it was clear that some had failed. Yes, there was paint delamination, and within the 711, the board looked and saw that there was a grouping, that the delamination was limited to a grouping of 2,550. That's where the 2,550 comes from. The board said, okay, there's an obvious grouping above the top serial number of 2,550 of that group, above the serial number, which is 13665. There were no transducers shown in the record with substantial paint or a leak problem. That's at addendum 52. None above that range did the DAV show to have any leak or paint problem. What does that mean, that there were different subcontractors or that there was a different process? What's the significance of that? Your Honor, the record does not reflect that. Well, why are you telling us that? Because it's a question of proof, Your Honor, how far out you can extrapolate from 102 transducers. A critical fact here is that there were three— 102 out of 711 is not insignificant. I am not saying how significant it is. There was a certain liability imposed. Yes, Your Honor. I think a really critical fact to remember here, though, is that there were three other leak paths that were causing leaks in these transducers. The counterbore leak path was the most dominant the board found. What does that have to do with this? We're talking about whether there's a defect across the board on the paint issue. And was there any testimony by anybody that there was a different process, as Judge Newman is asking you, that was applied to this range for which the board allowed recovery, as opposed to the rest of the range? Not about that particular range, no, Your Honor. But they did not show that there was an across-the-board defect because there were hundreds of transducers that were looked at that did not have the defect. So it was not an across-the-board material or workmanship issue. But if the defects were concentrated in the transducers that were used in the cold water and if these warships were not always going to be basking in the sun somewhere, then isn't there a larger significance to the large number of failures within a certain group of transistors? Well, the board also looked at the fact that the USS Thorn, a destroyer, was never pulled back to have its transducers removed. And it operated, certainly including in cold water, at least through 2002, years before the two-year warranty period. The board had it before that evidence. Here was the USS Thorn, no problem. Hundreds and hundreds of inspections where there were not problems with the transducers. But why isn't the Navy entitled to perfection in all this? No failures. And if there are any, without worrying about random sampling or anything else, if there are failures, a significant number. We know there was a significant number of failures, however you define significance. It wasn't trivial or accidental. That it's the contractor's responsibility. I think that arises the question of strict compliance, Your Honor. And once a breach has been found, a question of strict compliance arises. And Northrop Grumman could have provided strict compliance through testing every transducer and any transducer that did not have a paint problem, repairing the crosshatch marks with the barco bond, which was specifically allowed through the contract, and then remanufacturing any that had a problem. Northrop Grumman offered to do that, and the Navy refused. And the board found that was in part because the Navy did not want the aesthetics. That's at the addendum 26 to 27 in paragraph 68. That would have been strict compliance. Also, I have to say- Why didn't you have the obligation to come in once they've shown this significant failure rate, 102 out of 611, and say, well, we don't need to worry about the whole run because there was a different process that was used for paint preparation in this 2200 range. And so we can assume that the problem was limited to that range. And you didn't come in with evidence like that. There was no evidence in the record at all that the problem was limited to that range, other than the mere fact that that happened to be the range in which the failures were detected. Your Honor, if that was that kind of evidence, Northrop Grumman would have brought it in to prevent it having to do all this remanufacturing. But it may have been because a certain group of transducers was stored in some particular manner. There just isn't evidence that there was anything about the materials or workmanship for that period. And, in fact, what the Navy first did- But you knew- I mean, you ran the production line. You could have had people come in and testify that, you know, there was a- there is some evidence of a change in process here. You could have had somebody come in and testify that there was a change in process here which accounted for a problem in this particular area that didn't extend to the entire run. And you didn't come in with evidence like that, right? No, there wasn't that evidence, Your Honor. Instead, what the Navy first said is, it was the pigtail. We want you to go in, take these apart, fix the pigtail. That was the 944 repair. Northrop Grumman immediately did that and spent $3 million over the course of several months. And then as they were doing that, all of a sudden the Navy comes back and says, oh, all of a sudden we want all- because- and all of a sudden the Navy decided, no, we don't want that fixed because it realized the pigtail wasn't the only leak. The counterbores were the dominant leak, which was never proven to be Northrop Grumman's responsibility. So the Navy looked for- I don't understand why you're talking about these other leak paths. We're talking about whether because of the paint preparation problem they had to redo the entire run. And the question is who, to some extent, who had the burden of coming in and showing that this problem of 102 out of 711 wasn't representative of the whole run, but as the Board found, was only representative of this 2200 range. And I'm just wondering what the evidence is that supports the Board's conclusion that the problem was limited to that limited range. The evidence that the Navy brought to the Board. There was no evidence that there was any leak or delamination of paint above that serial number. And I guess I would answer the question about burden of proof in two ways. One, I think the case law is clear that the burden of proof is on the government to prove a latent defect for many reasons. But I think as a more practical matter, I would also point out, I think what Judge Prost was bringing up about the timing of the remanufacturing, we were doing this 944 repair for months. And then the Navy comes in and all of a sudden, on July 2nd, orders that all be remanufactured because of the paint. In our response to that, actually before that, on June 19th, they start asking for all this information that they had never asked for before, way beyond the contract, including information from the 1990 contract. We came back and in very good faith said, let's go to alternative resolution. We've always spent $3 million on this 944 repair. Let's get this taken care of by the end of the month. Then that was on June 12th. Actually, our response was on June 19th. Then the next thing we know, on July 2nd, we get this order to remanufacture all of them. When our request for ADR sampling testing was out there, they said, no, you just have to remanufacture all of them. Before you sit down, I want you to come back to the board's discussion of this 10% failure rate, which appears in a number of places in the opinion. It really raises in my mind a question of whether the board rejected the government's evidence, both on the paint and on the neoprene, because it thought that the government could only recover if it showed a failure rate in excess of 10%. There is language in there that suggests that. If that was a basis for the board's decision, it strikes me that's not correct. I don't believe that. That is not the statistical analysis underlying the board's determination. Do you agree it would be error if that was the basis for it? I think it would depend upon the proof, yes. I think that the Navy had the burden to come in and show that there was – So if the board had said we reject the proof because it doesn't show a failure rate higher than 10% outside of the 2200 range, in other words, 102 out of 711 is not more than 10%, therefore the government hasn't proven its case, that would be error, right? The problem I have, Your Honor – Would that be error? In this case, it's difficult to say because there were other causes of the failures. I know you don't see my point about the relevance of the other leak paths, but that was part of the problem here, that there were all these other leak paths that Northrop Grumman was not responsible for. But try with my hypothetical. If they'd said 102 out of 711 doesn't prove anything because the contractor was allowed a 10% failure rate, if they'd said that, that would have been wrong, right? And they did not say that because they – Would it have been wrong? Yes. I think that that would be an arbitrary standard to set. 102 out of 711 in this instance justified extrapolating to 2550 based on the 102. That is what the board did. I think giving the government a significant benefit of doubt on that proof because the board took it upon itself to take the burden of watching through these hours and hours of very tedious videos because the Navy did not present it to the board in that way. So if we read this as saying 102 out of 711 fails because it's not more than 10%, we'd have to send the case back, right? No, Your Honor. No? No. I think the way in which the board looked at the evidence before it, it had these transducers that people could not tell them where they had come from, what this was about, and they looked and saw – No, but you're not accepting my hypothetical. The only thing they say is 102 out of 711 isn't pertinent because it's less than 10%. I just think that oversimplifies it in such a way that – No, I understand. That's what hypotheticals do. They oversimplify. What's the answer to the hypothetical? I think that you'd have to apply the burden of proof to the Navy having to show the scope of the injury. That's part of showing the defect. You have causation, liability, and the resultant injury. And you have to show that there is a reasonable likelihood of some degree that there was a greater number that were defective than the ones actually proven. One thing I'm a little – I'll just ask one. 102 over 711 is more than 10%. No, it's 14%. Yes, it is. So even if the board had applied sort of erroneously provided a standard 10%, it wouldn't have – It would have to be 102 out of 1,000. Right, I would have thought that might be – And the 26% came from the board narrowing it down to the 2,550. But I understand that. Let me ask one just quick further question. My time is up. Did the parties agree to the 711 as a representative sample of something, and if so, of what? Was there agreement? I mean, the board just picked the 711. Pardon? It's what the Navy presented to the board. As a representative sample? Not a representative sample. As evidence of transducers with paint delamination. It was not a statistical sample at all. That's my understanding of the record. Thank you. Thank you, Your Honor. Mr. Wachowski, you can have your rebuttal time. Three minutes, please. Your Honors, I appreciate the rebuttal time. I'll be brief. First of all, with respect to the thorn, there was no evidence in the record about where the thorn was. So it's not accurate to suggest that the thorn had gone into cold water. So there simply was no evidence in the record on that. You all asked about evidence regarding workmanship. And what the evidence was. Those are the records that Northrop Grumman was required by the contract to maintain. That's where the evidence would have been. But it seems to me you've got a problem with that issue, do you not? Because, at least in the reconsideration, you put this up for the board. You said there's a problem with the contract, da-da-da, and the board said you haven't given us any record citations for this argument. Well, why shouldn't we defer? It's not necessarily a waiver. You made this argument to the board, but if the board rejects it because you give them nothing, no citations to the record, why should we defer to that? Because the board put it on the Navy to demonstrate the pervasiveness and the defects. No, but the Navy was coming forward with an argument on reconsideration, right? That Northrop failed to comply with the contract, correct? That's correct, Your Honor. And what the board said about that was, look, you give us one paragraph, no record citations, no citations to anything. This is just a deficient argument that we're not in a position to entertain. Am I right about that? I think it's fair to say that the board was exasperated with the Navy. Well, was the board correct in its observations about what the government had put forward and the inadequacies of that? I would not concede that the Navy was inadequate in its motion for reconsideration, Your Honor. It is a purely legal question as to which party needs to come forward once you have proof of a latent defect, and make no mistake about it, the board found a latent defect to exist, and that was the inadequate surface preparation. It was, by the board's findings, pervasive enough or extensive enough that it would require ships to be removed from anti-submarine service. That's the 10%, Your Honor. The failure rate of 10% renders the ships. But that's not the contract standard, right? It's not the contract standard, no. But so what we're worrying about is what is the contract standard, and the Navy doesn't have to prove more than 10% defects to establish a contract violation, right? The contract standard, I mean, it actually did spell out, I think, five grams of moisture over a five-year service life. That was the maximum amount of moisture permitted in the tubes because moisture in the transducer tubes, it compromises electronics. It's intuitive. And once you have a sufficiently high failure rate, 10%, you have to take the destroyers out of service. And, yes, as Judge Newman said, the Navy does not have the luxury of only being a warm-water Navy. Okay. We must move on. Thank you very much. I think we can't do it here. Thank you both, Mr. Wischowsky and Ms. Brinkman. The case is taken under submission.